NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| TRACY KELMAN, | |
| Plaintiff, | Civil Action No. 05-cv-2069 (PGS) |
| v. | OPINION |
| FOOT LOCKER, a division of Foot Locker Retail, Inc., | |
| Defendant. | |

## SHERIDAN, U.S.D.J.

This matter comes before the court on Defendant Foot Locker's motion for summary judgment. Foot Locker seeks dismissal of Plaintiff Tracy Kelman's four-count complaint alleging he was subject to discrimination because of his disability - a lifelong battle with colitis (Crohn's Disease), which led to a colostomy - and in violation of the American with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.* as well as the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. § 10:5-4. Kelman also alleges that Foot Locker breached an implied contract and the duty of good faith and fair dealing.

This action was commenced in the Superior Court of New Jersey, Middlesex County on March 15, 2005 and was timely removed to the district court pursuant to 28 U.S.C. §§ 1332(a) and 1441(a) on April 18, 2005.

In opposing defendant's motion, plaintiff failed to comply with at least four local and federal rules of civil procedure. Specifically, plaintiff failed (a) to submit timely opposition in violation of Local Civ. R. 7.1(d)(2); (b) to provide the Court with a statement of undisputed facts

pursuant to Local Civ. R. 56.1; (c) to keep the Court apprised of his current address pursuant to Local Civ. R. 10.1(a); and (d) to plead the law of the appropriate forum[1]. These deficiencies in and of themselves warrant quashing plaintiff's response to this motion and granting summary judgment. *Tellewoyan v. Wells Farg Home Mortgage*, Slip Copy, 2006 WL 2331108, at *2 (D.N.J. Aug. 10, 2006) (dismissing actions when plaintiff failed to notify court of address change); *see also Khaliq v. Brown*, 2005 WL 2406099 (D.N.J. Sept. 29. 2005); *Anastasia v. New Jersey Div. of Youth and Family Services*, 2005 WL 1607024, at *7 (D.N.J. July 6, 2005) (failure to comply with L. Civ. R. 7.1allows the court to deny a motion); *Satz v. Taipina*, 2003 WL 22207205, at *18 (D.N.J. April 15, 2003) (court will grant summary judgment when plaintiff improperly asserts claims under the NJLAD); *Cooper v. Cape May County Bd. of Social Services*, 175 F.Supp.2d 732, 741 (D.N.J. 2001) ("failure to comply with the Rule [L.Civ.R. 56.1] is itself sufficient to deny their motion"). Notwithstanding the above, the Court will consider this matter on the merits.

I.

At age twelve, Kelman was diagnosed with Colitis or Crohn's Disease, an inflammation of the lining of either the small or large intestine, or both. As a result of his medical condition, the 39 year-old has undergone several surgeries reducing his intestinal tract and ultimately inserting a colostomy bag for drainage/defecation. On July 31, 2001 Kelman began working as an at-will Associate Buyer in the Kids' Division of Foot Locker in New York City at a salary of $68,000 per year. It is undisputed that Kelmen did not disclose or discuss his medical condition with anyone at Foot Locker prior to March, 2003.

---

[1] It should be noted that plaintiff also failed to comply with the electronic filing requirements of Loc. Civ. R. 5.2.

The timeline of events based upon plaintiff's deposition and affidavit in opposition to this motion are is follows:

* On July 31, 2001, Plaintiff commenced work with Foot Locker as an Associate Buyer in the Kid's Division. There was no employment contract.

* On April 5, 2002, his annual evaluation for the year 2001 stated plaintiff was meeting expectations.

* Sometime in early 2002, certain co-employees kidded Kelman about being short. Kelman attributes his shortness to Crohn's. This comment was never disclosed to Foot Locker until depositions.

* In June, 2002 he was promoted to Associate Buyer in the Men's Division.

* Shortly thereafter, in September, 2002, Kelman's supervisor, Brian Callahan, discussed some performance based issues with plaintiff. With regard to the conversation, Kelman recalls very little. At depositions he stated:

> I believe probably around September, Brian had, I believe, there were a couple of things my supervisor felt that I needed to work on, and it basically came, it was basically that when I was told in the new position, just to continue to do what you've been doing to get you to this new level, but the nuances were a little different, so. It was based on that. Okay. These are the things that we do differently here that you need to be more aware of.

* On March 4, 2003 Kelman forwards a letter to Lois Swain, who is employed within Foot Locker's Human Services Division. The letter for the first time discloses two items to Foot Locker. They are (a) that Kelman suffers with Crohn's Disease, and that he utilizes a colostomy bag; and (b) certain co-workers in December, 2002 and February, 2003 ridiculed Kelman for foul odors present after Kelman utilized the bathroom facilities. Kelman attributes

the odors to his colostomy. Lastly, Kelman requests Swain to keep his condition confidential, unless there was a real need for someone to know.

* On March 27, 2003, Callahan admonished Kelman because of an error Kelman committed.

* On April 11, 2003, Callahan confronted Kelman about allegedly sharing confidential corporate information with third parties; and making many personal telephone calls.

* In June, 2003, Kelman's colostomy bag gurgled and a co-employee laughed asking "what is that noise?" Kelman did not report the incident to human resources; but he was embarrassed.

* In September, 2003, Callahan conducts Kelman's 2002 annual job review, and Kelman's performance is rated as unsatisfactory. Kelman is placed on a 30 day plan in which he is allegedly given an opportunity to improve.

* On November 6, 2003, Callahan, seeing no improvement, fires Kelman.

Based on these sparse facts, the court ordered oral argument in order to fill in some of the holes in the record, and make certain that all plaintiff's arguments were considered. Oral argument only served to further obfuscate the record. At oral argument, plaintiff's attorney argued that Kelman never received any negative feedback about his job performance but for the September, 2003 job review. This, as shown above, is inconsistent with the record. Similarly, defendant's counsel alluded to a December, 2002 meeting between Kelman and Callahan to discuss his job performance. There is nothing in the record which supports such a conversation in December.

When asked by the court about what actions, if any, Lois Swain took after receiving Kelman's March, 2003 letter, and whether Callahan was apprised of Kelman's condition, defendant's attorney responded that "it is not part of the record." Plaintiff's attorney conceded

that depositions of Foot Locker's personnel were not taken, so he did not know. Further, the Court suggested that it was peculiar that Kelman's 2002 job review was not conducted until September, 2003. Again, defendant indicated that the reason for the delay, if any, is not part of the record; and plaintiff, without offering any proof, indicated that the review was put off by Foot Locker from the spring to the autumn in order to avoid temporal proximity arguments if he were fired at a time that was close to his notice to Swain. However, the performance review may have complied with Foot Locker's personnel policies. It should be noted, that the September 2003 review may have been conducted in accordance with defendant's "Associate Handbook". Specifically, the handbook states that "[y]ou can expect your performance on the job will be reviewed with you by your manager. These reviews can occur at any time, but will occur at least 12 months after each prior review or salary action." (Venator Group Associate Handbook, p. 8.)

Paraphrasing, the plaintiff's claim can be summed up as follows. There were inappropriate remarks made to Kelman prior to him giving notice of his condition to Foot Locker in March, 2003. Subsequent to his notification, he was treated differently in that he was isolated or ignored by co-workers. Thereafter, there was another inappropriate comment (gurgling incident). In addition, his 2002 job review was conducted suspiciously and extraordinarily late (September 2003) rather than March or April as was Foot Locker's practice. This, plaintiff argues, the totality of the circumstances give rise to an inference from which a jury could find unlawful dismissal and/or substantiate a hostile work environment claim.

II.

Summary judgment is appropriate under FED. R. CIV. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for

the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1130-31 (3d Cir. 1995). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also* FED. R. CIV. P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a genuine issue for trial"). Moreover, only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgement. *Anderson*, 477 U.S. at 247-48.

III.

The defendant argues that plaintiff's claims pursuant to the ADA must be dismissed for failing to show that Kelman is disabled within the meaning of the Act. Under ADA, a disability is a "physical or mental impairment that substantially limits one or more of the major life activities." 42 U.S.C. §12102(2)(a). *See, Winter v. Cycam*, 166 Fed. Appx. 593, 595 (3d Cir. 2006). In some instances, Crohn's Disease falls within the umbrella of ADA. *Davis v. The*

6

*Guardian Life Ins. Co.*, 2000 WL 1848596 (ED Pa Dec. 15, 2000). In *Davis*, plaintiff's Crohn's Disease forced her to miss 209 work days of work in 5 years. *Id.* at *1. She was absent an additional 699 days in 7 years on maternity leave. *Id.* Plaintiff was afforded the opportunity to work a flexible schedule from home due to her medical condition and her commute, but based on her absenteeism, was finally asked to adhere to a written work schedule. *Id.* at *1-2. Davis required accommodations; the flexible schedule, installation of a computer, fax and dedicated phone line, payed for courier service, etc. *Id.* at *6. In *Davis,* the Court recognized that Crohn's was a disability under the ADA, and the Court found the accommodations provided were satisfactory. However, the facts here are clearly distinguishable from *Davis*. Kelman required no accommodations. Kelman during his deposition testified that he could "function like anyone else in the work environment," he could take care of himself and he needed no special assistance or accommodations at work. Kelman noted that his illness tends to make relationships difficult, and he can not swim; but beyond that, his life is unaffected. Under these circumstances, Kelman's condition does not meet the ADA test and is clearly distinguishable from *Davis v. The Guardian*. *See also, Winter v. Cycam*, 166 Fed. Appx. at 595 (*citing* 42 U.S.C. § 12102(2)(A)). Accordingly, Kelman has no disability as defined within the ADA.

IV.

Since New Jersey law is broader than ADA, Kelman may have a disability under NJLAD. For purposes of the motion defendant does not contest that point; but argues Plaintiff has not established a prima facie case pursuant to the NJLAD because he fails to show a connection between his disability and his termination. (Def's Brief at 16). A prima facie claim under NJLAD requires a "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) causal connection

between the employee's protected activity and the employer's adverse action." *Fogelman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567-68 (3d Cir. 2002). In this case, there is no proof of causal connection. But for the possible delay in receiving his annual review subsequent to giving notice to defendant of his ailment, the record is void of discriminatory intent. There is neither proof that Kelman was treated differently than other employees, nor whether Kelman's supervisor, Callahan, even knew of Plaintiff's condition. From the facts presented, no reasonable jury could find that Kelman's termination was related to his disease. *Sally v Circuit City Stores, Inc.*, 160 F.3d 977, 981 (3d Cir. 1998); *Kelly v. Drexel Univ.*, 94 F.3d 102, 109 (3d Cir. 1996).

Plaintiff argues that *Zive v. Stanley Roberts, Inc.*, 182 N.J. 436, 867 A.2d 1122 (2005) supports his position that there is sufficient evidence to show a causal connection between his injury and his termination. A fair reading of *Zive* suggests otherwise. *Zive* establishes the evidentiary burden the plaintiff must meet to satisfy the second prong of the burden-shifting test. Plaintiff suffered a debilitating stroke in 1998 while employed by Stanley Roberts as head of the "Homeworld" division. *Id.* at 1136. Homeworld's sales fluctuated between 1995 and 1997. *Id.* Zive worked from home after his stroke because the left side of his body was paralyzed. *Id.* In March, 1999 he decided to return to work, but was told his "services were no longer required." *Id.* Although there had been talk of discontinuing the Homeworld divisions, after Zive's termination, he was replaced with someone who performed essentially the same functions and the division continue to operate. *Id* at 1137.

The Supreme Court of New Jersey analyzed Zive's discriminatory firing claim. The Court found that a plaintiff, in order to establish a *prima facie* case, must establish that he (1) belongs to a protected class, (2) was performing in the position from which he was terminated, (3) nevertheless was fired, and (4) the employer sought someone to perform the same work after

he left. *Id.* at 1139. The Court in *Zive* said, "[i]mportantly, until the time of his stroke, he had never been told that his job was at stake." *Id.* at 1144. This is not the case here. Kelman acknowledges being criticized for his work performance shortly after his promotion in September 2002, as well as on March 27 and April 11, 2003.

Assuming *arguendo* that plaintiff established a *prima facie* case, then the burden shifts to Foot Locker to show its indiscriminate purpose for firing Kelman. In a discrimination case, to defeat summary judgment when the defendant answers the plaintiff's *prima facie* case with legitimate, non-discriminatory reasons for its action (in this case poor performance), the plaintiff must point to some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *Davis*, 2000 WL 122357 at *2 (ED Pa, 2000) (citing *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)). Kelman has provided no evidence to refute Foot Locker's claim of their legitimate, non-discriminatory termination of his employment. It is not enough for plaintiff to raise mere nuances to refute the movant's position. The plaintiff must demonstrate such "weakness, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them "unworthy of credence," and hence infer "that the employer did not act for the asserted non-discriminatory reasons." *Id.* (citing *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 638 (3d Cir. 1993)). Plaintiff provided no such evidence.

Recently, the Third Circuit, in affirming the District Court's granting of summary judgment in *Winter v. Cycam*, opined that there can be no discrimination where a plaintiff fails to provide any evidence to suggest that the employer knew about a plaintiff's condition. *Winter,*

166 Fed. Appx at 595. As noted above, Kelman requested of Swain that his medical condition "remain confidential, and only be disclosed to necessary parties."[2] It is unknown whether Callahan knew of his condition at the time of Kelman's dismissal. It is not part of the record. *Leonard v. Metropolitan Life Ins. Co.*, 723 A.2d 1007, 1011 (App. Div. 1999).

V.

Because plaintiff's Crohn's Disease fails to meet the ADA standard for a disability, plaintiff's claim of hostile work environment is rooted in NJLAD. However, plaintiff, a New Jersey resident, has sued defendant, a New York corporation for actions and/or omissions allegedly incurred while plaintiff was working for defendant in New York. Clearly, this raises a choice of law issue for the Court.[3] Upon review of the NJLAD and the well-established caselaw, no cause of action exists in this instance.

The NJLAD does not apply every time a New Jersey resident alleges that he has suffered a discrimination. *Satz*, 2003 WL 22207205 at *15. Specifically, "New Jersey courts have consistently applied the law of the state of employment to workplace claims, and have therefore only applied the NJLAD if the plaintiff worked in New Jersey." *Id.* at *16; *Bucilli v. Timby, Brown & Timby*, 283 N.J. Super. 6, 11 (App.Div. 1995) (the "claim of a New Jersey resident for her allegedly wrongful dismissal from out-of-state employment is governed by the law of the state in which she was employed."); *Shamley v. I.T.T. Corp.*, 869 F.2d 167, 172 (2d Cir. 1989)("Because workers who reside in several states work side by side in New York state, New

---

[2] Kelman letter to Swain dated March 4, 2003.

[3] An Order was issued by this Court on October 18, 2006, affording the parties an opportunity to submit a short supplemental brief explaining why New York law should not be applied in this matter in lieu of NJLAD. Plaintiff's counsel failed to provide a brief, and the notification of said order was returned to this Court as undeliverable.

10

York has a very practical reason for maintaining a uniform approach to employer/employee relations....'employees in [a company's] New York office should not be subject to different legal principles depending on the state of the employee's domicile.'"). According to the New Jersey Practice Series on Employment Law, "[t]he NJLAD protects...both residents and non-residents working in New Jersey. Employees working outside New Jersey, however, are not protected even if they are New Jersey residents." 18 N.J. Prac., Employment Law § 4.2 (2d ed.), 18 NJPRAC § 4.2 (West 2006). The choice of law principles dictate that, given the New York employment at issue here, New York law should be applied in this case. *Perry v. Prudential-Bache Securities, Inc.*, 738 F.Supp. 843, 854 (D.N.J. 1989). Thus, the applicable New York law is New York State law against Unlawful Discriminatory Practices (McKinney's Executive Law § 296, hereinafter "NYUDP"). Plaintiff, however fails to bring any claim under the NYUDP. Thus, plaintiff's claim for hostile work environment must be dismissed.

Assuming *arguendo*, that this Court would consider plaintiff's claim brought under NYUDP, plaintiff still fails to make a *prima facie* case of discrimination. The plaintiff has established (and Foot Locker does not dispute) that there were four comments made to Kelman during the course of his employment of about two years. They are the two remarks referred to in his letter to Swain, the comment about his colostomy bag in June, 2003, and one about his height prior to his promotion to the Men's Division in July 2002.[4] In addition, plaintiff's attorney claims that after the letter, Kellman was isolated from others. It would be relevant to know what steps, if any, Foot Locker took to prevent future inappropriate comments after Kelman's notice in

---

[4] Plaintiff's allegation that he was ridiculed for being short, and his shortness is related to Crohn's Disease may require expert testimony to link this allegation. However, this is not before the court.

March, 2003. It would seem to reason that Callahan, Kelman's supervisor, as well as Swain, would have knowledge of such efforts; but this avenue of discovery was not undertaken by plaintiff's attorney. The analysis of claims under the NYUDP parallels the analysis of Claims under Title VII, 42 U.S.C. § 2000e *et seq. Rechichi v. Eastman Kodak Co.*, 2004 WL 1698333 at *4 (W.D.N.Y. Jan. 21, 2004) (citing *Cruz v. Coach Stores, Inc.*, 202 F .3d 560, 565 n. 1 (2d Cir.2000)). To survive a motion for summary judgment involving a hostile work environment claim, a plaintiff must elicit evidence from which a reasonable trier of fact could conclude (1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of plaintiff's work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer. *Id.* at *5 (citing *Mack v. Otis Elevator Co.*, 326 F.3d 116, 122 (2d Cir. 2003)). With regard to the first of these elements, it is clear that [i]solated instances of harassment ordinarily do not rise to th[e] level [of a hostile work environment]. *Id.* Rather, the plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment. Determining whether workplace harassment was severe or pervasive enough to be actionable depends on the totality of the circumstances. *Id.*

"As a general matter, isolated remarks or occasional episodes of harassment will not merit relief under [NYUDP]; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." *Id.* at 6 (citing *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir. 1998)). Factors which the Court should consider include "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a 'mere offensive utterance;' (4) whether

the conduct unreasonably interfered with plaintiff's work; and (5) what psychological harm, if any, resulted." *Richardson v. New York State Dep't of Correctional Servs.*, 180 F.3d 426, 437 (2d Cir.1999). Under the applicable New York law, Kelman fails to establish the necessary frequency of defendant's conduct, its severity or that anything amounted to more then 'mere offensive utterances.' There was only one remark after Kelman wrote to Swain. There is no evidence of pervasive conduct. As such plaintiff's hostile work environment must be dismissed.

## VI.

Finally, Plaintiff's retaliation claim lacks merit. In order to maintain a retaliation claim, the "timing of the alleged retaliatory action must be unusually suggestive of retaliatory motive before a causal link will be inferred." *Shellenberger v. Summit Bancorp, Inc.*, 318 F. 3d 183, 189 n.9 (3d Cir. 2003) (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997)). In *Williams v. Philadelphia Housing Auth. Police Dept.*, 380 F.3d 751, 760 (3d Cir. 2004), the Third Circuit established that a two month time lapse coupled with other evidence was enough to negate a retaliation claim. In the instant matter, Plaintiff's initiating action was his March 2003 letter to Human Resources. Six months prior to Kelman's letter, Callahan spoke to him about his job performance, and six months passed after the March letter before he was placed on a remedial action plan. Kelman was not terminated until eight months after the initiating act, and thus was well-beyond the window for temporal proximity of retaliatory action.

## VII.

Defendant argues that plaintiff's claims pursuant to certain contractual theories are unfounded. Since plaintiff did not oppose this aspect of the motion, the claims are dismissed.

13

In accordance with this Opinion, Defendant's motion for summary judgment on all Counts is granted based on both procedural and substantive grounds.

November 16, 2006

_____
PETER G. SHERIDAN, U.S.D.J.